IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:11-CV-42-FL

| | | |
|---|---|---|
| STEPHEN DILGER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| CHERYL ANNE MEADS, formerly | ) | |
| known as Cheryl Davis Eckerd, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the court upon plaintiff's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (DE # 14), defendant's motion to defer ruling on that motion pursuant to Rule 56(d) (DE # 28), and plaintiff's motion to dismiss defendant's counterclaims pursuant to Rule 12(b)(6) (DE # 38). These matters have been fully briefed, and are now ripe for decision. For the reasons that follow, plaintiff's Rule 56 motion is granted in part, defendant's Rule 56(d) motion is denied, and plaintiff's Rule 12(b)(6) motion is granted.

## STATEMENT OF THE CASE

This specific performance and breach of contract action was filed in Wake County Superior Court on December 9, 2010. According to plaintiff, defendant repudiated a binding agreement to purchase certain real property in Wake Forest, North Carolina. Defendant removed the action to this court on January 27, 2011, asserting diversity of citizenship jurisdiction pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. The court denied defendant's motion to dismiss the complaint by oral order on March 16, 2011.

On February 23, 2011, plaintiff moved for summary judgment. Defendant responded in opposition on March 16, 2011, and plaintiff timely replied. On March 31, 2011, plaintiff asked the court to defer ruling on the summary judgment motion pending further discovery. Plaintiff responded in opposition on April 1, 2011, and defendant timely replied.

On April 1, 2011, defendant filed answer to the complaint. In the responsive pleading, defendant included counterclaims against plaintiff for fraud, negligent representation, breach of contract, breach of the duty of good faith and fair dealing, and declaratory judgment. She amended her answer on April 4, 2011. On April 14, 2011, plaintiff moved to dismiss the amended counterclaims. Defendant responded on May 5, 2011, and plaintiff timely replied.

## STATEMENT OF THE FACTS

The undisputed facts, in the light most favorable to defendant as the nonmoving party, are as follows. On July 11, 2010, plaintiff and defendant entered into a written contract for the sale of 1300 Glennis Court, Wake Forest, North Carolina. Defendant agreed to pay plaintiff a purchase price of $4,195,000.00 for the property. As admitted by plaintiff in her answer, a true and accurate copy of the contract was attached to the complaint as Exhibit A.

On November 12, 2010, defendant's attorney sent a letter to plaintiff purporting to terminate the contract, asserting three specific grounds for termination. First, defendant contended that "the property did not appraise at a value equal to or exceeding the purchase price in accordance with sections 7 or 4 of the agreement." (Compl. Ex. B.) Second, defendant contended that section 16 of the agreement permitted her to terminate for any reason. (Id.) Third, she contended that plaintiff's misrepresentation about the amount of monthly homeowner's association dues was grounds for termination. (Id.)

2

The portion of the agreement which purports to contain an appraisal contingency reads as

follows:

> 7. OTHER CONDITIONS: (State N/A in each blank that is not a condition to this contract.)
>
> (a) There must be no restriction, easement, zoning or other governmental regulation that would prevent the reasonable use of the Property for **RESIDENTIAL** purposes.
>
> (b) The Property must be in substantially the same or better condition at Closing as on the date of the offer, reasonable wear and tear excepted.
>
> (c) The Property must appraise at a value equal to or exceeding the purchase price or, at the option of Buyer, this contract may be terminated and all earnest monies shall be refunded to Buyer, even if the Loan Condition has been waived as provided in paragraph 5.
>
> If this contract is NOT subject to a financing contingency requiring an appraisal, Buyer shall arrange to have the appraisal completed on or before **NO APPRAISAL**.
>
> (d) All deeds of trust, liens and other charges against the Property, not assumed by Buyer, must be paid and satisfied by Seller prior to or at Closing such that cancellation may be promptly obtained following Closing. Seller shall remain obligated to obtain any such cancellations following Closing.
>
> (e) Title must be delivered at Closing by GENERAL WARRANTY DEED unless otherwise stated herein, and must be fee simple marketable and insurable title, free of all encumbrances, except: ad valorem taxes for the current year (prorated through the date of Closing); utility easement, and restrictive covenants that do not materially affect the value of the Property; and such other encumbrances as may be assumed or specifically approved by Buyer. The Property must have legal access to a public right of way.

(Compl. Ex. A at ¶ 7.) The words "RESIDENTIAL" and "NO APPRAISAL," displayed in bold

above, are handwritten in all capital letters in black ink in underlined spaces.

The language in Section 16 of the contract, which defendant also relies on for her right to

terminate, reads in relevant part as follows:

3

□ ALTERNATIVE 2. (*This Alternative applies ONLY if Alternative 2 is checked AND Buyer has paid the Option Fee.*)

(a) Property Investigation with Option to Terminate: In consideration of the sum set forth in paragraph 4(c) paid by Buyer to Seller (not Escrow Agent) and orther valuable consideration, the sufficiency of which is hereby acknowledged (the "Option Fee"), Buyer shall have the right to terminate this contract for any reason or no reason, whether related to the physical condition of the Property or otherwise, by delivering to seller written notice of termination (the "Termination Notice") by 5:00 p.m. on **N/A**, 20**N/A**, *TIME BEING OF THE ESSENCE* (the "Option Termination Date"). At any time prior to Closing, Buyer shall have the right to inspect the Property at Buyer's expense (Buyer is advised to have all inspections/investigations of the Property, including but not limited to those matters set forth in Alternative 1, performed. prior to the Option Termination Date).

(b) Exercise of Option: If Buyer delivers the Termination Notice prior to the Option Termination Date, *TIME BEING OF THE ESSENCE*, this contract shall become null and void and all earnest monies received in connection herewith shall be refunded to Buyer; however, the Option Fee will not be refunded and shall be retained by Seller. If Buyer fails to deliver the Termination Notice to Seller prior to the Option Termination Date, then Buyer will be deemed to have accepted the Property in its physical condition existing as of the Option Termination Date; provided such acceptance shall not constitute a waiver of any rights Buyer has under paragraphs 5, 6 or 7 above. The Option Fee is not refundable, is not a part of any earnest monies, and will be credited to the purchase price at Closing.

(c) CLOSING SHALL CONSTITUTE ACCEPTANCE OF THE PROPERTY IN ITS THEN EXISTING CONDITION UNLESS PROVISION IS OTHERWISE MADE IN WRITING.

(Compl. Ex. A at ¶ 16.) Again, the term "N/A" represented in bold above is handwritten in black ink in the original document. The box next to "Alternative 2" is not checked.

Finally, the only mention of homeowner's association fees in the contract is found at paragraph 9, and reads as follows:

9. PRORATIONS AND ADJUSTMENTS: Unless otherwise provided, the following items shall be prorated and either adjusted between the parties or paid at Closiug: (a) Ad valorem taxes on real property shall be prorated on a Calendar year basis through the date of Closing; (b) Ad valorem taxes on personal property for the entire year shall be paid by the Seller, unless the personal property is conveyed to the

4

Buyer, in which case, the personal property taxes shall be prorated on a calendar year basis through the date of Closing; (c) All late listing penalties, if any, shall be paid by Seller; (d) Rents, if any, for the Property shall be prorated through the date of Closing; (e) Owners' association dues and other like charrges shall be prorated through the date of Closing. Seller represents that the regular owners' association dues, if any, are $**75** per **MONTH**. Unless otherwise agreed, Buyer shall pay any fees required for obtaining account payment information on owners' association dues or assessments for payment or proration and any charge made by the owners' association in connection with the disposition of the Property to Buyer, including any transfer and/or document fee imposed by the owners' association.

(Compl. Ex. A at ¶ 9.) Once more, the words "75" and "MONTH" are handwritten in black ink in all capital letters in the contract.

To the extent the court finds ambiguity in the language of the contract, the parties have submitted conflicting affidavits as to their intent. Lyn Greenway ("Greenway"), who is listed on the contract as the buyer's (*i.e.*, defendant's) agent, asserts that the parties "agreed that there would be no appraisal contingency . . . [because defendant] stated that she believed the purchase price was a fair price" and that "[i]t was clear that [defendant] understood prior to the signing of the contract that it did not include an appraisal contingency." (Greenway Aff. ¶ 3.) This understanding is confirmed by Stephen Dilger ("Dilger"), plaintiff's president, who stated that he and Greenway discussed "that there would be no appraisal contingencies, nor would there be any appraisal done on the [p]roperty," and that he later confirmed with defendant that "she understood that there was no appraisal contingency and that no appraisal would be done on the home." (Dilger Aff. ¶¶ 10, 15.) According to Dilger, he was "concerned about having an appraisal contingency . . . because high-end homes are notoriously difficult to appraise due to lack of comparable sales" as well as the fact that foreclosures caused by the recent economic downturn had "artificially lower[ed] the appraisal value of real estate." (Id. ¶ 11.)

5

Defendant, by contrast, stated in her affidavit that she never discussed the details of the contract with Greenway, and that neither Greenway nor Dilger told her that she would not have the option to have the home appraised. (Meads Aff. ¶¶ 17, 20.) Indeed, defendant contends that she understood Greenway to be a dual agent who was representing both plaintiff and herself, and that she had no written contract with Greenway and never gave Greenway authority to bind her. (Id. ¶¶ 11, 28, 32.) She also states that she never agreed that there would be no appraisal contingency in the contract. (Id. ¶¶ 20, 25.) She further states that the property appraised for $3,400,000.00, or $795,000.00 less than the purchase price provided in the contract. (Id. ¶ 20 & Ex. C.)

## DISCUSSION

A.    Plaintiff's Motion for Summary Judgment on Its Breach of Contract Claim

    1.    Standard of Review

"Summary judgment is not solely a defensive mechanism: Rule 56 expressly contemplates the availability of summary judgment to a claimant." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 521 (4th Cir. 2003). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to find for the non-moving party. Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate with specific evidence

6

that there exists a genuine issue of material fact requiring trial. <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).

       2.      Defendant's Request Under Rule 56(d)

      Defendant asks the court to defer consideration of plaintiff's summary judgment motion under Rule 56(d), arguing that she cannot present facts essential to justify her opposition absent additional discovery. In particular, defendant argues that the issue of witness credibility is crucial to the adjudication of plaintiff's motion and that this case involves complex factual issues regarding the parties' intent under the contract and the purported agency of Greenway. Defendant has filed an affidavit certifying that no discovery other than initial disclosures has taken place in this case.

      As defendant rightly notes, the general rule is that "summary judgment is appropriate only after adequate time for discovery." <u>Harrods Ltd. v. Sixty Internet Domain Names</u>, 302 F.3d 214, 244 (4th Cir. 2002). The court must particularly take care where "fact-intensive issues, such as intent, are involved." <u>Id.</u> However, contrary to defendant's assertions, no such issues are present here. As discussed below, the court resolves plaintiff's summary judgment motion based upon the unambiguous language of the contract and the other material in the pleadings, so additional discovery "will not create a genuine issues of material fact because . . . such evidence may not be used to create an ambiguity in [an] otherwise unambiguous [contract]." <u>See</u> <u>Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.</u>, 565 F.3d 948, 963 (5th Cir. 2009).[1]

      Accordingly, where this routine contract interpretation case does not require discovery beyond the materials already before the court, defendant's Rule 56(d) motion is DENIED.

---

[1] Defendant appears to realize that no discovery is needed in the face of an unambiguous contract where she argues that the evidence currently before the court is sufficient to "grant judgment in [defendant's] favor under Rule 56(f)(1)" based on her interpretation of that contract. (Def.'s Mem. Supp. Rule 56(d) Motion 3.)

3.    Analysis

This court is sitting in diversity, and must apply North Carolina substantive law to plaintiff's breach of contract claim. See Homeland Training Ctr., LLC v. Summit Point Auto. Research Ctr., 594 F.3d 285, 290-91 (4th Cir. 2010). To prevail on that claim, plaintiff must show that "a valid contract existed between the parties, that defendant breached the terms thereof, the facts constituting the breach, and that damages resulted from such breach." Capparelli v. AmeriFirst Home Improvement Fin. Co., 535 F. Supp. 2d 554, 563 (E.D.N.C. 2008) (internal quotation marks omitted). Because the contract at issue is one to convey land, specific performance may be ordered. Hutchins v. Honeycutt, 286 N.C. 314, 318, 210 S.E.2d 254, 256-57 (1974); see also Kidd v. Early, 289 N.C. 343, 364, 222 S.E.2d 392, 407 (1976).

a.    Validity

The court begins its analysis by looking to the first element of a breach of contract action, which requires it to determine whether, on the undisputed facts before it, there exists a valid contract between the parties for the sale of real property. To be valid, a contract must be based on "the mutual assent of both parties to the terms of the agreement," as evidenced by an offer and the acceptance of that offer. Snyder v. Freeman, 300 N.C. 204, 218, 266 S.E.2d 593, 602 (1980). Additionally, a contract for the sale of real property must be in writing and signed by the parties. River Birch Assocs. v. City of Raleigh, 326 N.C. 100, 123, 388 S.E.2d 538, 551 (1990). The writing must contain the names of the grantor and grantee, the price or consideration, and a description of the property to be sold. Id.

The undisputed evidence in the record shows that the contract is in writing, that it is signed by the parties, that it contains the names and signatures of both the grantor (plaintiff) and grantee

8

(defendant), the price or consideration, and a description of the property. Nevertheless, defendant challenges the validity of the contract in her first, second, and fifth counterclaims, alleging that she was induced to sign the contract by plaintiff's misrepresentations. Defendant seeks rescission and a declaratory judgment that no valid contract exists. See, e.g., Capparelli, 535 F. Supp. 2d at 564-65; Mills v. Dunk, 263 N.C. 742, 140 S.E.2d 358 (1965). Accordingly, to determine the validity of the contract, the court must first address defendant's fraud and negligent misrepresentation counterclaims.[2]

Under North Carolina law, the essential elements of a fraud claim are "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." Rowan Cnty. Bd. of Educ. v. U.S. Gypsum Co., 332 N.C. 1, 17, 418 S.E.2d 648, 658 (1992). To state a negligent misrepresentation counterclaim, defendant must put forward sufficient allegations that she "justifiably relie[d] to [her] detriment on information prepared without reasonable care by one who owed [her] a duty of care." Raritan River Steel Co. v. Cherry, Bekaert & Holland, 322 N.C. 200, 206, 367 S.E.2d 609, 612 (1988).

"A false representation is material when it deceives a person and induces him to act." Keith v. Wilder, 241 N.C. 672, 675, 86 S.E.2d 444, 446 (1955). The false misrepresentation must be "definite and specific," although "the specificity required depends on the tendency of the statements to deceive under the circumstances." Ragsdale v. Kennedy, 286 N.C. 130, 139, 209 S.E.2d 494, 500

---

[2] In her amended answer, defendant also maintains that the contract was not binding because it was not fully executed, referring to a confidentiality agreement not attached to the complaint. In response, plaintiff attached an executed copy of the confidentiality agreement, as transmitted to defendant by Greenway via email, to its memorandum in support of its motion to dismiss. Defendant's allegations therefore are flatly contradict the record before the court. In any event, the confidentiality agreement is a separate agreement from the contract to purchase real property that is at issue in this case, and its validity is immaterial to the question at hand.

(1974). "[A]ny reliance on the allegedly false representations must be reasonable," and "reasonableness . . . is a question for the jury, unless the facts are so clear that they support only one conclusion." Forbis v. Neal, 361 N.C. 519, 27, 649 S.E.2d 382, 387 (2007). "[A] complaint claiming fraud is fatally defective unless it alleges detrimental reliance . . . with particularity." Frank M. McDermott, Ltd. v. Moretz, 898 F.2d 418, 421 (4th Cir. 1990).[3]

Defendant's fraud claims are based on her allegations that plaintiff "falsely represented . . . that the [property] was worth far more than it actually was," "falsely represented that the amount of the homeowners' association dues were less than they actually were," "falsely represented [that] it was a licensed real estate agent or broker," "concealed that [defendant] could not rent out or use the [property] as a secondary residence," and "provided . . . an incorrect copy of the covenants and restrictions on the [property] prior to the execution of the [c]ontract." (Def. Counterclaim ¶¶ 37-39, 41-43.) Plaintiff asserts that these allegations are insufficient to state a claim, even if accepted as true. Specifically, it notes that each of the alleged misrepresentations could have been discovered if defendant had exercised due diligence and undertaken an independent investigation.

Plaintiff's argument enjoys support in longstanding North Carolina case law. For example, in Harding v. Southern Loan & Insurance Co., the North Carolina Supreme Court stated:

> Representations concerning the value of real property or its condition and the adaptation to particular uses will not support an action in deceit unless the purchaser has been fraudulently induced to forbear inquiries which he would otherwise have made, and if fraud of this latter description is relied on as an additional ground of action, it must be specifically set forth in the declaration.

---

[3] Defendant's "counterclaim for negligent misrepresentation is simply a repackaging of [her] claim for fraud" and the same justifiable reliance principles apply to each. See Suntrust Mortg., Inc. v. Busby, 651 F. Supp. 2d 47, 485 (W.D.N.C. 2009). In his case, defendant's negligent misrepresentation counterclaim succeeds or fails for the same reasons as her fraud counterclaim. See, e.g., id.

It is generally held that one has no right to rely on representations as to the condition, quality or character of property, or its adaptability to certain uses, where the parties stand on an equal footing and have equal means of knowing the truth. The contrary is true however where the parties have not equal knowledge and he to whom the representation is made has no opportunity to examine the property or by fraud is prevented from making an examination. When the parties deal at arm's length and the purchaser has full opportunity to make inquiry but neglects to do so and the seller resorted to no artifice which was reasonably calculated to induce the purchaser to forego investigation, action in deceit will not lie.

218 N.C. 129, 10 S.E.2d 599, 601-02 (1940).

Almost twenty years later, the court elaborated on the principles set forth in Harding,

explaining:

The right to rely on representations is inseparably connected with the correlative problem of the duty of a representee to use diligence in respect of representations made to him. The policy of the courts is, on the one hand, to suppress fraud and, on the other, not to encourage negligence and inattention to one's own interest.

Calloway v. Wyatt, 246 N.C. 129, 134-35, 97 S.E.2d 881, 886 (1957). The court noted that "[j]ust

where reliance ceases to be reasonable and becomes such negligence and inattention that it will, as

a matter of law, bar recovery for fraud is frequently very difficult to determine." Johnson v. Owens,

263 N.C. 754, 758, 140 S.E.2d 311, 314 (1965); see also id. ("A plaintiff who, aware, has made a

bad bargain should not be allowed to disown it; no more should a fraudulent defendant be permitted

to wriggle out on the theory that his deceit inspired confidence in a credulous plaintiff.").

Applying these principles, which have existed as part of North Carolina common law for

more than seventy years, the North Carolina Court of Appeals recently held:

With respect to the purchase of [real] property, reliance is not reasonable if a plaintiff fails to make any independent investigation unless the plaintiff can demonstrate: (1) [she] was denied the opportunity to investigate the property, (2) [she] could not discover the truth about the property's condition by exercise of reasonable diligence, or (3) [she] was induced to forego additional investigation by the defendant's misrepresentations. In an arm's-length transaction, when a purchaser of property has

11

the opportunity to exercise reasonable diligence and fails to do so, the element of
reasonable reliance is lacking and the purchaser has no action for fraud.

RD&J Properties v. Lauralea-Dilton Enterprises, LLC, 165 N.C. App. 737, 746, 600 S.E.2d 492, 499

(2004) (internal quotation marks and alterations omitted). With this case law firmly in mind, the

court turns to defendant's allegations of fraud.

First, there can be no doubt that plaintiff's statement regarding the value of the property is

not actionable as fraud. In light of the bedrock principles cited above, North Carolina courts

consistently have held that exaggerated representations by a seller as to property's value are mere

"puffery" on which a buyer is not entitled to rely. See Horton v. Humble Oil & Refining Co., 255

N.C. 675, 680, 122 S.E.2d 716, 720 (1961) ("Representations which merely amount to a statement

of opinion go for nothing. One who relies on such affirmations made by a person whose interest

might prompt him to invest the property with exaggerated value does so at his peril, and must take

the consequences of his own imprudence."); Lester v. McLean, 242 N.C. 390, 397, 87 S.E.2d 886,

891 (1955) ("The value of the property . . . was necessarily a matter of opinion. It does not appear

to have been represented as anything else. Under the decisions of this Court, such representations

do not constitute fraud."); Bolich v. Prudential Ins. Co. of Am., 206 N.C. 144, 173 S.E. 320, 326

(1934) ("[E]xpressions of opinion by a seller, amounting to nothing more than . . . extravagant

statements as to value . . ., are not, as a rule, to be regarded as fraudulent in law."). As such,

plaintiff's representation that the property would have sold for $13,000,000.00 in a better market is

a statement that cannot, as a matter of law, support a cause of action for fraud.[4]

---

[4] Defendant alleges that plaintiff prevented her from conducting an appraisal of the property. (See Def.
Counterclaim ¶ 14.) Had this occurred prior to the execution of the contract, plaintiff's fraud claim might have merit.
But where the allegations clearly indicate that this conduct occurred after the contract had been executed (indeed,
defendant alleges that plaintiff breached the contract by doing so), there has been no fraud in the inducement.

12

Second, although plaintiff's representations regarding the amount of the homeowner's association dues and the ability of the home to be used as a rental or secondary property might be actionable in certain circumstances, see, e.g., Shreve v. Combs, 54 N.C. App. 18, 282 S.E.2d 568 (1981), those circumstances are not presented here.[5] The seller in Shreve, who was held liable in fraud for falsely claiming he could convey the property without any encumbrances, "knew or had reason to believe that [the buyer] intended to construct a house on the property, that she probably would not purchase the property unless she could build on it, and that she would have difficult securing construction financing because of the encumbrances." Id. at 22, 282 S.E.2d at 573. Here, by contrast, there is no allegation that plaintiff knew or should have known that the homeowner's dues or the ability to rent out the property were of central importance to defendant's purchase of the property. Indeed, there are only than conclusory allegations that these misrepresentations induced her to contract or that they were of central importance in her decision to purchase the property. See Frank M. McDermott, Ltd., 898 F.2d at 421 (requiring detrimental reliance to be pleaded with specificity). Absent such allegations, it is not plausible that plaintiff's statement to defendant that the homeowner's fees were $75.00 per month when they were in fact "over $100.00" was calculated to induce her to purchase a property worth $3.5 million to $4 million.

---

[5] In Shreve, the North Carolina Court of Appeals held that a "statement that it would be no problem to get a clear, free title to the property, made with knowledge that the property was heavily encumbered," was sufficient to establish a claim for fraud. 54 N.C. App. at 22, 282 S.E.2d at 573. "[A] federal court sitting in diversity has a duty to apply the operative state law as would the highest court of the state in which the suit was brought." Liberty Mut. Ins. Co. v. Triangle Indus., Inc., 957 F.2d 1153, 1156 (4th Cir. 1992). Where the highest state court has not spoken to an issue, this court looks to decisions of the state's intermediate appellate court decisions, "although such decisions may be disregarded if the federal court is convinced by other persuasive data that the highest court of the state would decide otherwise." Id. (internal quotation marks omitted). In light of Harding and subsequent North Carolina Supreme Court cases, and where "a purchaser of land is chargeable with notice of a restrictive covenant by the record itself if such covenant is contained in any recorded deed or other instrument in his line of title, even though it does not appear in his immediate deed," see Lamica v. Gerdes, 270 N.C. 85, 89, 153 S.E.2d 814, 817 (1967), the court believes that the North Carolina Supreme Court might not endorse a broad understanding of Shreve. Nevertheless, where defendant's claim can be distinguished from that case, the court need not resolve this question.

13

Finally, the court briefly addresses defendant's allegations that plaintiff misinformed her that it was a licensed real estate agent or broker and concealed from her that Dilger was living in the property prior to the sale. Plaintiff's president, Dilger, does in fact have a North Carolina real estate license, which is a matter of public record. (See Pl.'s Mot. to Dismiss Ex. 4.) But regardless of whether this real estate license is attributable to plaintiff itself, other than the conclusory statement that defendant was deceived, there are no factual allegations in the complaint that would support an inference that this alleged misrepresentation was reasonably calculated to deceiver or that defendant's understanding of plaintiff's real estate license was material to inducing her to enter into the contract. See Frank M. McDermott, Ltd., 898 F.2d at 421. The same holds true for the fact that Dilger was living in the home prior to sale, as defendant has not alleged with particularity that avoiding the requirements of the North Carolina Residential Property Disclosure Act was something that was of central importance to her purchase of the house and that plaintiff knew this and induced her to enter the contract by misrepresenting its applicability.[6]

Because defendant's allegations that the contract was secured by fraud or negligent misrepresentation fail as a matter of law, the court concludes that the agreement between the parties to convey the property was valid. The court will accordingly proceed to the circumstances surrounding defendant's alleged breach.

      b.    Breach

Because the contract was entered into in North Carolina, the court looks to that state's law in interpreting the contract's terms to determine whether a breach has occurred. See Tanglewood

---

[6] As plaintiff noted, defendant's right to cancellation of the contract under the Residential Property Disclosure Act expired three days after the contract was entered. See N.C. Gen. Stat. § 47E-5(b)(2). Her counterclaims seeking rescission were brought well beyond this deadline.

14

Land Co., Inc. v. Byrd, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980); see also Seabulk Offshore, Ltd. v. Am. Home Assur. Co., 377 F.3d 408, 418-19 (4th Cir. 2004). Under North Carolina law, "[w]hen the language of a contract is clear and unambiguous, construction of the contract is a matter of law for the court." Hagler v. Hagler, 319 N.C. 287, 294, 354 S.E.2d 228, 234 (1987). The subjective understanding of a party as to the legal significance of a contract's term is immaterial to the contract's interpretation if the language is unambiguous. Mobil Oil Corp. v. Wolfe, 297 N.C. 36, 39, 252 S.E.2d 809, 811 (1979). Parol evidence may be used to determine the intent of the contracting parties if (and only if) the contract's language is ambiguous. Lattimore v. Fisher's Food Shoppe, Inc., 313 N.C. 467, 474, 329 S.E.2d 346, 350 (1985).

It is not disputed that defendant purported to terminate the contract by asserting that she had the right to do so under various provisions of the contract. And under North Carolina law, if no such right is to be found in the contract, defendant's letter informing plaintiff of her intent not to follow through with her obligations under the agreement constitutes an actionable anticipatory breach. See Oestreicher v. Am. Nat'l Stores, Inc., 290 N.C. 118, 138, 225 S.E.2d 797, 810 (1976) (defining "anticipatory breach" as "a repudiation of [a party's] contractual duty before the time fixed in the contract for his performance has arrived . . . made either by word of by act"). Accordingly, in light of aforementioned principles of contract construction, the question before the court is limited to whether the unambiguous language of the contract permitted defendant to terminate the agreement in the circumstances presented here. If the contract is ambiguous with respect to that question, the court may resort to parol evidence.

The court begins by quickly disposing of defendant's contention that Alternative 2 of Paragraph 16 of the contract, which is written so as to allow a buyer to terminate "for any reason or

15

no reason" by providing a written notice of termination, allowed her terminate the contract. That provision explicitly states that it "applies ONLY if Alternative 2 is checked AND Buyer has paid the Option Fee." (Compl. Ex. A ¶ 16.) The box next to "Alternative 2" was *not* checked, paragraph 4(c) of the contract indicates that defendant did not pay any option fee, and "N/A" has been written in the space for the deadline for providing the written notice of termination. By its own unambiguous terms, this provision did not apply here. Defendant's argument to the contrary is completely without merit.

Similarly, defendant has been unable to point the court to any provision in the contract that permits her to terminate if the homeowner's association fees are not as represented in paragraph 9 of the contract. Under North Carolina law, defendant is charged with notice of the homeowner's association fees, which were restrictive covenants in the public record. See Lamica, 270 N.C. at 89, 153 S.E.2d at 817. Indeed, the first paragraph of the contract advises defendant to review any restrictive covenants and to obtain a copy of any homeowner's association disclosures. And notwithstanding defendant's allegations to the contrary, it appears from the undisputed evidence before the court that defendant was actually given the appropriate restrictive covenants. Moreover, the court reiterates its previous holding that the contract cannot be rescinded or voided due to any fraud or misrepresentation regarding the homeowner's fees on the facts as alleged here.

The only justification given by defendant for terminating the contract that merits any discussion is that the property appraised for less than the contract price. The undisputed evidence before the court does suggest that the property appraised for less than $4,195,000.00 (Meads Aff. ¶ 20 & Ex. C.) Defendant relies on the following language in the contract, which she contends permits termination in such circumstances:

16

7. OTHER CONDITIONS: (State N/A in each blank that is not a condition to this contract.)

. . . .

(c) The Property must appraise at a value equal to or exceeding the purchase price or, at the option of Buyer, this contract may be terminated and all earnest monies shall be refunded to Buyer, even if the Loan Condition has been waived as provided in paragraph 5.

If this contract is NOT subject to a financing contingency requiring an appraisal, Buyer shall arrange to have the appraisal completed on or before **NO APPRAISAL**.

(Compl. Ex. A ¶ 7.)

Plaintiff contends that the handwritten words "NO APPRAISAL" unambiguously exclude the appraisal contingency otherwise provided for in the contract. Defendant, by contrast, contends that this language either unambiguously retains the appraisal contingency while indicating that there is no date by which buyer must complete the appraisal, or is ambiguous and not subject to a definite construction on the undisputed facts. The purported ambiguity in the language is also the basis for defendant's motion to delay ruling on the summary judgment motion, as she feels additional discovery will be necessary to explore the parties' intent with respect to an appraisal contingency.

The question before the court boils down to the meaning of the words "NO APPRAISAL," because these handwritten words control in the event of a conflict with the pre-printed words of the form contract signed by the parties. See Standard Acc. Ins. Co. v. Harrison-Wright Co., 207 N.C. 661, 178 S.E. 235, 240 (1935); see also In re B.E., 186 N.C. App. 656, 661, 652 S.E.2d 344, 347 (2007) (noting that it is "an elementary principle of contract interpretation" that written words prevail over printed words). A term is ambiguous if its "effect is uncertain or capable of several reasonable interpretations." Register v. White, 358 N.C. 691, 695, 599 S.E.2d 549, 553 (2004). If the contract

17

defines a term, that definition is used in interpreting the contract. Singleton v. Haywood Elec. Membership Corp., 357 N.C. 623, 629, 588 S.E.2d 871, 875 (2003). Otherwise, the court will look to the term's "meaning in ordinary speech, unless the immediate context clearly indicates another meaning was intended." Id. "Since the object of [contract] construction is to ascertain the intent of the parties, the contract must be considered as an entirety. The problem is not what the separate parts mean, but what the contract means when considered as a whole." Atl. & N.C. R.R. Co. v. Atl. & N.C. Co., 147 N.C. 368, 61 S.E. 185, 190 (1908).

The only reasonable interpretation of the words "NO APPRAISAL," inserted in a paragraph that would otherwise allow the buyer to terminate the agreement if the appraisal value was too low, is that no appraisal of the property was to be performed and the contract was not contingent on any such appraisal. Although the term "N/A" might have been ambiguous because it could be read as indicating that the contract was subject to a financing contingency requiring an appraisal, the words "NO APPRAISAL" can mean nothing else to a reasonable person but that there would be no appraisal in connection with the sale of the property.

Defendant has suggested two alternative interpretations of the language in question, but neither interpretation is reasonable. Defendant's argument that the words "NO APPRAISAL" mean nothing more than that the buyer is not *required* to conduct an appraisal of the property defies common sense. Because the contract was not subject to a financing contingency, the contract (if left unaltered) is written so as to *permit* the buyer to conduct an appraisal and terminate the agreement if the property did not appraise for the purchase price; but nothing in the language could be read as *requiring* the buyer to conduct an appraisal. The only appraisal "requirement," found in the second part of paragraph 7(c), is that the appraisal be completed before a specific date in order to create a

18

deadline for the buyer's exercise of the termination option. Where the contract was already framed so as not to require an appraisal, defendant's interpretation would require the court to ascribe to these handwritten words no significance whatsoever.[7] See Nelson v. Rhem, 179 N.C. 303, 102 S.E. 395, 396 (1920) (rejecting an interpretation of a contract provision where the court would have been required to "assume that the parties have inserted meaningless terms in their agreement"); Price v. Cox, 83 N.C. 261, 1880 WL 3335, at *3 (1880) (holding that "some force must be given to . . . [added] words" lest they become "mere surplusage . . . and meaningless"); see also N.C. Ins. Guar. Ass'n v. Century Indemnity Co., 115 N.C. App. 175, 184, 444 S.E.2d 464, 470 (1994) ("We assume that parties to an insurance contract do not create meaningless provisions.").

Defendant's alternative understanding of the words is equally unreasonable. Defendant seizes on the fact that the words "NO APPRAISAL" appear in a line in which a date would otherwise appear to argue that these words simply indicate that she was permitted to conduct the appraisal at any time prior to closing. But the sentence "Buyer shall arrange to have the appraisal completed on or before no appraisal" is nonsensical, and certainly doesn't indicate that an appraisal could be conducted at any time. Had the parties in fact intended to convey that there was no deadline for conducting the appraisal before closing, they presumably would have written "CLOSING" (or the date on which closing was to occur) in that space, so that the sentence would have read: "If this contract is NOT subject to a financing contingency requiring an appraisal, Buyer shall arrange to have the appraisal completed on or before CLOSING."

---

[7] This same reasoning reinforces the court's conclusion that the only reasonable interpretation of "NO APPRAISAL" is that the contract was not subject to an appraisal contingency. Whereas defendant argues that the words remove or alter a provision that does not otherwise appear in the contract (*i.e.*, that the buyer must get the property appraised), the court's understanding is that the words alter a provision that appears in plain language appearing immediately before (*i.e.*, that the buyer has the right to terminate in the event of a below-purchase-price appraisal).

The lack of any grammatical or syntactical integrity in the sentence as written indicates that the use of the space for a date was mere happenstance, and that the words written therein must be interpreted on their own in the context of the entire contract rather than the few words immediately preceding them in the sentence. As already explained, the only reasonable explanation of "NO APPRAISAL" in paragraph 7(c) is that no appraisal of the property was to be performed and that the contract was therefore not subject to an appraisal contingency. Accordingly, defendant was not permitted to terminate the contract by invoking this provision, any more than she was entitled to terminate under paragraph 16 or to terminate because the homeowner's association fees were greater than she was informed. Because none of these provisions allowed defendant to terminate the contract, and yet she did so anyway, she has committed an anticipatory breach.

        c.     Damages

It is not disputed that plaintiff has suffered damages as a result of defendant's actions here. Plaintiff has lost the benefit of its bargain, an alternative buyer for the property was not found, and plaintiff's lender initiated foreclosure proceedings. It is not clear whether the property has been foreclosed upon at this time, and thus the court cannot ascertain whether plaintiff is ready, willing and able to convey the property as would be necessary for specific performance. See Munchack Corp. v. Caldwell, 301 N.C. 689, 694, 273 S.E.2d 281, 285 (1981); see also Cavenaugh v. Cavenaugh, 317 N.C. 652, 657, 347 S.E.2d 19, 23 (1986). ("Specific performance will not be decreed against a defendant who is incapable of complying with his contract."). Accordingly, plaintiff's motion for summary judgment is GRANTED only as to the issue of liability.

The court believes that the issue of damages may also be resolved on summary judgment if appropriate briefing is made. Accordingly, plaintiff shall submit proof of the amount of damages

20

and/or proof regarding the availability of specific performance within fourteen days of date of entry

of this order. Defendant shall have fourteen days from service of plaintiff's submission to respond,

and plaintiff shall have seven days from service of defendant's response to file any reply.

B.      Plaintiff's Motion to Dismiss Defendant's Counterclaims

        1.      Standard of Review

A motion to dismiss under Rule 12(b)(6) determines only whether a claim is stated; "it does

not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."

Republican Party v. Martin, 980 F.2d 943, 952 (4th Cir. 1992).[8] A claim is stated if the complaint

contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550

U.S. 544, 570 (2007)). An individual alleging fraud must "state with particularity the circumstances

constituting [the] fraud," Fed. R. Civ. P. 9(b), including "the time, place, and contents of the false

representations, as well as the identity of the person making the representations and what he obtained

thereby," Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999). In

evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes

these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions,

elements of a cause of action, and bare assertions devoid of further factual enhancement." Nemet

Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009). Nor will the court

---

[8]The court has discretion to convert plaintiff's Rule 12 motion to one under Rule 56, see Bosiger v. US Airways, Inc., 510 F.3d 442, 450 (4th Cir. 2007), particularly where there is a factual record developed in furtherance of plaintiff's motion for summary judgment. Despite this discretion, the court has endeavored to measure defendant's counterclaims based solely on the pleadings and other matters which may be considered under Rule 12, including documents attached to the pleadings, documents attached to plaintiff's motion to dismiss that are integral to the complaint and authentic, and matters of public record of which judicial notice may be taken. See Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). In light of the unambiguous nature of the contract at issue and the court's resolution of plaintiff's motion for summary judgment, the court did not have cause to look to any extrinsic evidence.

21

accept as true "unwarranted inferences, unreasonable conclusions, or arguments." <u>Wahi v.</u> <u>Charleston Area Med. Ctr., Inc.</u>, 562 F.3d 599, 615 n.26 (4th Cir. 2009).

2.     Analysis

a.     Fraud and Negligent Misrepresentation

The court has already discussed defendant's claims of fraud and negligent misrepresentation in some detail. This discussion will not be repeated here, save to reiterate that these claims fail primarily because defendant did not allege circumstances supporting a plausible inference of reasonable reliance on the misrepresentations, for the reasons set forth in <u>Harding v. Southern Loan</u> <u>& Insurance Co.</u>, 218 N.C. 129, 10 S.E.2d 599 (1940), and its progeny. Specifically, exaggerated valuations of property provided by that property's owner are not actionable as fraud in North Carolina, <u>see</u> <u>Horton</u>, 255 N.C. at 680, 122 S.E.2d at 720, and defendant's allegations are insufficient to raise a plausible inference that plaintiff's other alleged misstatements about trivial matters such as the amount of the homeowner's association fees were reasonably calculated to deceive defendant and to induce her to enter into the agreement, <u>see</u> <u>Frank M. McDermott, Ltd</u>, 898 F.2d at 421. For these reasons, plaintiff's motion to dismiss is GRANTED as to the first two counterclaims.

b.     Breach of Contract and Breach of Duty of Good Faith and Fair Dealing

As with defendant's fraud and negligent misrepresentation claims, the need for a detailed discussion of defendant's breach of contract action has been largely obviated by the court's discussion of plaintiff's breach of contract action. Based on the unambiguous language of the agreement itself, the court has held that the contract did not permit defendant to terminate in the circumstances presented here. Accordingly, defendant's claims for breach of contract based on allegations that plaintiff "failed to return . . . earnest money upon the proper termination of the

22

[c]ontract" and "failed to honor [defendant's] right to terminate the [c]ontract" (Def.'s Counterclaim ¶¶ 64(a) and (b)) necessarily fail as a matter of law.

Defendant's other allegations of breach are likewise unavailing. She alleges that plaintiff "failed to provide a North Carolina Residential Property Disclosure Statement prior to the signing of the [c]ontract," "failed to provide correct restrictions and covenants that apply to the . . . [p]roprety prior to the [c]ontract's execution," and "failed to provide the owner's association disclosure or addendum or correct amount of the dues." (Def.'s Counterclaim ¶¶ 64(c)-(e).) Nothing in the contract requires these actions to have been taken, and plaintiff's conduct prior to the contract's execution and not mentioned therein are not actionable as breach of contract. See Root v. Allstate Ins. Co., 272 N.C. 580, 587, 158 S.E.2d 829, 835 (1968) ("[I]t is presumed that all prior negotiations are merged into the written instrument."). In fact, the contract itself states:

> Prior to signing this [o]ffer . . ., Buyer is advised to review [r]estrictive [c]ovenants, if any, which may limit the use of the Property, and to read the Declaration of Restrictive Covenants, By-Laws, Articles of Incorporation, Rules and Regulations, and other governing documents of the owners' association and/or the subdivision, if applicable. If the Property is subject to regulation by an owners' association, it is recommended that Buyer obtain a copy of a completed Owners' Association Disclosure And Addendum . . . prior to signing this [o]ffer . . ., and include it as an addendum hereto.

(Compl. Ex. A ¶ 1.) Thus, far from requiring plaintiff to provide this information before execution, the language in the contract recommended that defendant ascertain the information for herself.

Additionally, defendant alleges that plaintiff "failed to actively continue to market the property in accordance with the first right of refusal addendum" and "failed to immediately deliver written notice to [defendant] that [plaintiff] had received another offer." (Def.'s Counterclaim ¶¶ 64(f) and (g).) Even if this were true, defendant has failed to allege any damages stemming from

23

plaintiff's failure. See Capparelli, 535 F. Supp. 2d at 563 (holding that a party must allege that damages resulted from the breach to assert a cause of action). Indeed, the only damages alleged are "the time value of her earnest money" and the "expend[iture] of time and resources on this lawsuit." (Def.'s Counterclaim ¶ 65.) These damages did not arise out of plaintiff's alleged failure to continue to market the property or to deliver notice to defendant of another offer. If anything, plaintiff's failure to continue to market the property would go towards the issue of mitigation of damages with respect to plaintiff's meritorious breach of contract action. See generally Little v. Rose, 285 N.C. 724, 728, 208 S.E.2d 666, 669 (1974).

Finally, defendant alleges that plaintiff "has breached the Confidentiality Agreement by disclosing Confidential Information to [p]laintiff's lenders" and further that it has "failed to assure that its agents executed the Confidentiality/Non-Disclosure portion of the Agreement." (Def.'s Counterclaim ¶¶ 64(h) and (i).) Once again, however, defendant has not identified any damages caused by such breach. See Capparelli, 535 F. Supp. 2d at 563. Instead, she asserts that discovery will be necessary to determine whether and to what extent she has been damaged by any breach of the confidentiality agreement. This is plainly not permitted under Iqbal. See 129 S. Ct. at 1950 ("Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."). Additionally, the court notes that the defendant's allegation that plaintiff's agents did not sign the Confidentiality Agreement is flatly contradicted by the agreement itself, which is attached to plaintiff's motion to dismiss.

In short, defendant's breach of contract allegations fail in light of the court's disposition of plaintiff's motion for summary judgment, the plain language of the agreements at issue, and the lack of any damages that stem from the alleged breach. Moreover, because a "cause of action for breach

24

of the covenant of good faith and fair dealing is 'part and parcel' of [a] claim for breach of contract" such that "absent a breach of the contract, there is no cause of action for breach of an implied covenant of good faith," Lord of Shalford v. Shelley's Jewelry, Inc., 127 F. Supp. 2d 779, 787 (W.D.N.C. 2000), this claim also fails. For these reasons, plaintiff's motion to dismiss is GRANTED as to the third and fourth counterclaims asserted by defendant.

  c. Declaratory Judgment

In her last cause of action, which arises under 28 U.S.C. § 2201, defendant asks the court to declare "either that no valid contract exists or that [defendant] had the right to terminate the Contract based upon one or more reasons set forth in the termination letter" and to further declare that defendant's "termination of the Contract was proper and . . . that the $100.00 in earnest money shall be returned to [defendant] in accordance with the Contract." (Def.'s Counterclaim ¶ 83.) In light of the disposition of plaintiff's breach of contract claim and defendant's other counterclaims, such declaratory relief is not appropriate. Accordingly, plaintiff's motion to dismiss is GRANTED as to this final counterclaim.

## CONCLUSION

For the reasons set forth above, plaintiff's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (DE # 14) is GRANTED IN PART, defendant's motion to defer ruling on that motion pursuant to Rule 56(d) (DE # 28) is DENIED, and plaintiff's motion to dismiss defendant's counterclaims pursuant to Rule 12(b)(6) (DE # 38) is GRANTED. Plaintiff is awarded summary judgment on its breach of contract action only on the issue of liability.

Within fourteen days of date of entry of this order, plaintiff shall submit proof of the amount of damages and/or proof regarding the availability of specific performance. Defendant shall have

25

fourteen days from service of plaintiff's submission to respond, and plaintiff shall have seven days from service of defendant's response to file any reply. The court will endeavor to promptly act once the issue of damages is fully briefed.

SO ORDERED, this the ___17___ day of May, 2011.

LOUISE W. FLANAGAN
Chief United States District Judge

26